## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL SMITH, personal representative for the )
estate of MARY ANN SMITH,                     )
                                              )
      Plaintiff,                          )
                                              )  CIVIL ACTION NO. 3:09-CV-249
      v.                                  )  JUDGE KIM R. GIBSON
                                              )
UNITED STATES OF AMERICA                      )
                                              )
      Defendant.                          )

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. BACKGROUND

The above-captioned case is brought under the Federal Tort Claims Act ("FTCA"), 28

U.S.C. §§ 1346(b), 2671-2680, and the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301,

and Survival Act, 42 Pa.C.S. § 8302. Plaintiff in this case is Daniel Smith, personal

representative for the estate of Mary Ann Smith. Defendant is the United States of America.

Plaintiff claims that Scott D. Marlowe, M.D., a radiologist employed by Defendant at the James

E. Van Zandt Veterans Administration Medical Center in Altoona, Pennsylvania, provided

negligent medical care to Mary Ann Smith, ultimately resulting in her death on June 4, 2008.

Plaintiff originally brought suit in this Court on September 21, 2009, asserting claims

against six Defendants: the United States, Marlowe, Mohammed Dowlut, M.D., Robert Scott,

M.D., Annashae Corporation, and Mercy Medical Imaging Associates, P.C. Doc. No. 1.

Plaintiff amended his Complaint on February 2, 2010, eliminating Marlowe as a party due to

Marlowe's agency relationship with the United States. Doc. No. 23. Thereafter, Defendants

Annashae Corporation, Dowlut and Scott filed an Answer and Crossclaim against Defendants

1

United States, Marlowe, and Mercy Medical Imaging Associates, P.C. Doc. No. 26. By stipulation of the parties, Mercy Medical Imaging Associates, P.C. was subsequently dismissed as a defendant from the case on July 15, 2010. Doc. No. 36. Defendant United States of America then filed its own Answer and Crossclaim against Defendants Annashae Corporation, Dowlut and Scott. Doc. No. 39. On January 24, 2012, counsel for Defendants Annashae Corporation, Dowlut and Scott informed the Court that they had executed a joint tortfeasor release with Plaintiff, thus dismissing said Defendants from the case. Doc. No. 87. This Court held a bench trial as to the remaining claims against Defendant United States on January 27 and 31 and February 1, 2012.

## II. FINDINGS OF FACT

The circumstances of this case are deeply tragic, as they involve the premature death of a loving wife and mother who was responsible for the needs of her fully-grown child. Plaintiff's decedent, Mary Ann Smith (hereinafter Smith), was born on March 3, 1966 in Montgomery, Alabama. Doc No. 74 at 2. When she was 20 years old, she entered the United States Air Force, where she served as an allergy and immunology specialist from 1986 to 1994. During that time, she met Timothy McClain, also serving in the Air Force, and the two began a romantic relationship. Doc. No. 92 at 100. They married in 1990, and on November 7 of that year Smith gave birth to a son, Brandon McClain. Doc. No. 74 at 2; Doc. No. 92 at 101. Unfortunately, the couple's joyful reception of the child into their lives was soon marred by a stunning realization: Brandon had been born with multiple brain malformations which would prevent him from developing – both mentally and physically – at a rate considered normal for children his age. Now 21 years old, Brandon McClain suffers from numerous conditions, including severe mental retardation, epilepsy, cerebral palsy, scoliosis, autism, and optic nerve damage. These conditions

2

severely inhibit Brandon's ability to perform daily activities, including eating and walking. Doc. No. 74 at 9. From the day of Brandon's birth, Smith provided him with constant care and assistance, which enabled him to live as full a life as possible under the circumstances. Doc. No. 93 at 7. Smith remained Brandon's primary caretaker after her divorce from Timothy McClain in 1994. Doc. No. 92 at 102-4. This involved her staying home with Brandon full time, feeding him, dressing him, and changing his diapers. Doc. No. 93 at 8. She also administered his medication and coordinated his visits with medical professionals. Id. at 11.

Smith met her future husband, Daniel Smith, on February 3, 1996. Doc. No. 93 at 5. A few months later, Daniel Smith met Brandon for the first time, and quickly accepted him, despite Mary Ann Smith's concerns that he would not want to see her anymore because Brandon had a disability. Id. at 5-6. Daniel Smith and Brandon McClain soon developed a bond through a range of shared activities, including riding Daniel Smith's motorcycle together. Id. at 25-6. Mary and Daniel Smith were married on September 4, 1998, and the family resided in Duncansville, Pennsylvania from that date until Smith's death. Id. at 6. The Smiths also frequently spent time with each other's families. Id. at 22-24. During their ten years together, the Smith family enjoyed what was, by all accounts, a "very happy" period. Id. at 12, 20; Pl. Ex. 13. In the final years of her life, Smith was able to pursue a career performing accounting and other administrative duties for a local chiropractor. Id. at 9-10. As each year passed, she assumed more responsibilities in this position. Id. For 2007, her last full year of employment, Smith earned $24,058. Doc. No. 93 at 57.

Unfortunately, the Smiths' happy family existence was forever changed on May 19, 2008. On that day, at approximately 10:46 a.m., Smith telephoned the James E. Van Zandt Veterans Administration Medical Center in Altoona, Pennsylvania (hereinafter "the VA"), and

3

reported that earlier that morning she had passed out for ten minutes, fallen off the toilet, vomited, and developed a severe migraine headache, which rendered her sensitive to light and sound. Doc. No. 98 at 3. Her fall from the toilet had been so severe that she broke it loose from the floor. Doc. No. 93 at 29. Smith's symptoms also included pulsating pressure from her neck to the top of her head, paleness, and feelings of weakness and shakiness. Smith further informed the VA that she had taken migraine medication, which had at least partially alleviated her headache, and inquired as to whether she should come to the hospital for a checkup. Pl. Ex. 2 at 43. Peggy Hutton, a physician's assistant in the employ of the United States, informed the nurse who took Smith's call that Smith should come immediately to the VA emergency room, as Hutton was concerned that Smith's symptoms could have resulted from any one of a number of serious conditions, including a brain aneurysm. Doc. No. 98 at 4-5.

Smith arrived at the hospital at approximately 4:50 p.m. the same day. Pl. Ex. 2 at 39, 43. Upon presentation, she related to hospital staff that while on a toilet at home, she experienced a tingling in her neck and blurred vision, and then passed out. After regaining consciousness, she realized that she had fallen off the toilet, and subsequently vomited and had diarrhea. Shortly afterward, she developed a migraine headache and neck pain. Pl. Ex. 2 at 41. Hospital staff referred Smith to Mohammed M. Dowlut, M.D., a physician provided to the VA by Annashae Corporation, an independent contractor. Doc. No. 92 at 70-1. On that day, Dowlut was staffing the emergency room at the VA under the Annashae contract, whereby he supplied medical officer of the day services to the hospital. Doc. No. 93 at 89-91. This arrangement rendered Dr. Dowlut's medical judgment and treatment independent of VA oversight. Def. Ex. A at 15; Doc. No. 93 at 91.

4

After consulting the medical record prepared by the hospital, Dowlut discussed Smith's symptoms with her.  She once again reported having passed out earlier in the day and experiencing neck pain, although her headache had gone away.  Doc. No. 92 at 72.  In her medical chart, Dowlut assessed Smith's condition to include syncope (loss of consciousness or passing out), migraine headache, and chronic neck arthralgia.  Pl. Ex. 2 at 39.  According to Daniel Smith, who later discussed his wife's visit to the hospital with her, Mary Ann Smith asked Dowlut whether her symptoms could be a brain aneurysm.  Doc. No. 93 at 47.

After discussing Smith's symptoms, Dowlut performed a neurological examination on her, which revealed no apparent abnormalities.  He then ordered a variety of tests, including blood work, an electrocardiogram, an x-ray of her cervical spine, and a non-contrast CT head scan.  Doc. No. 92 at 72-3; Pl. Ex. 2 at 36.  However, not included in Dowlut's recommended panel of tests was a lumbar puncture, which likely would have detected the presence of blood in Smith's cerebrospinal fluid.  Doc. No. 94 at 14.  Because there was no radiologist on duty at the VA on May 19, Smith was unable to have the tests performed that day.  At trial, Dowlut claimed that he advised Smith that she should be admitted to the hospital for observation pending a CT scan and x-ray in the hospital the following morning.  Doc. No. 72 at 73-4.  He added that, against his medical advice, Smith declined this invitation, given her need to care for her son Brandon, but she assured Dowlut that she would return in the morning to have the tests done.  Id. However, there is nothing in the medical record to suggest that such advice was ever given.  Pl. Ex. 2 at 35-9; Doc. No. 92 at 82; Doc. No. 94 at 18-19.  Nor did Smith mention any advice by Dowlut to stay at the hospital when she later discussed the visit with her husband.  Doc. No. 93 at 49.  Smith was discharged from the VA later that evening.  Pl. Ex. 2 at 35.

5

On May 20, the following day, Smith returned to the hospital and underwent a CT scan at approximately 8:09 a.m. Pl. Ex. 2 at 6. She also obtained an x-ray of her cervical spine. Doc. No. 93 at 3. Before completing his shift at the hospital that morning, Dowlut confirmed that Smith had arrived to have the tests performed. Doc. No. 92 at 73-4. Prior to leaving the hospital, Smith met with Peggy Hutton and requested a cervical collar for her neck pain. Hutton also prescribed physical therapy, which was to commence on June 23. Pl. Ex. 2 at 24.

Later that day, a radiologist at the VA read Smith's cervical spine x-ray and indicated that it demonstrated a loss of the cervical lordosis, or curvature of the spine, which suggested that Smith was suffering from neck muscle spasms. Pl. Ex. 2. That same day, Scott Marlowe, M.D., a radiologist and employee of the United States, read Smith's non-contrast CT scan. Doc. No. 93 at 2-3; Pl. Ex. 2 at 6-8. At trial, two experts presented by Plaintiff testified as to what Smith's CT scans indicated. Michelle Whiteman, M.D., a neuroradiologist, testified that Smith's CT scan was abnormal, as there was little to no evidence of certain brain structures known as sulci, likely due to edema or the significant presence of blood in Smith's brain. Doc. No. 92 at 44, 47-50. As Whiteman described, this would have been a clear sign to a radiologist that there was something wrong with Smith. Id. at 47. Other brain landmarks, known as sylvian fissures, were also absent from the scan. Id. at 48-9. These combined signs were indicative of an aneurysm and/or possible subarachnoid hemorrhage. Id. at 53-7. As Michelle Whiteman vividly explained, this meant that Smith's condition was the medical equivalent of "a time bomb about to explode." Id. at 57. Mitchell Whiteman, M.D., a radiologist, also testified that that Smith's CT scan was suspicious for possible subarachnoid hemorrhage and represented an "emergency" which required immediate action. Doc. No. 102 at 28-30.

6

However, despite this overwhelming evidence, and for reasons never explained at trial, Marlowe reported that Smith's CT scan was an "unremarkable study". Doc. No. 93 at 2-3; Pl. Ex. 2 at 7.  Smith telephoned the VA on May 21 at approximately 10:07 a.m. for the results, at which point a nurse informed her of Marlowe's conclusions. Pl. Ex. 2 at 32-3.  About three days later, Dowlut reviewed and signed the medical test results that he had prescribed for Smith. Doc. No. 92 at 74.  However, Dowlut did not review the actual films. Id. at 85.  Dowlut never ordered a lumbar puncture for Smith, and he took no further action after reviewing her test results. Doc. No. 92 at 77, 84-5; Doc. No. 104-1 at 52; Pl. Ex. 2 at 25-9.

Over the next few days, Smith's symptoms receded in part.  However, on the morning of May 26, she attempted to take a bath and experienced extreme pain in her tailbone while sitting down in the tub. Pl. Ex. 2 at 28.  Smith also experienced heaviness in her arms, neck spasms, and a pounding or "whooshing" sound in her ears. Id; Doc. No. 93 at 31, 43-4.  Accordingly, at approximately 2:15 p.m. that day, she returned to the VA with her husband to seek further treatment Pl. Ex. 2 at 30; Doc. No. 93 at 44-5.  Upon arrival, she was treated by Robert Scott, M.D., who supplied emergency room and medical officer of the day services to the VA through Annashae Corporation. Doc. No. 92 at 86-9.  As with Dowlut's services, the contract between Annashae and the VA rendered Dr. Scott's medical judgment and treatment independent of VA oversight. Doc. No. 93 at 91.  Scott reviewed Smith's medical records, which included her prior reported symptoms from her May 20 visit, along with the written report of the CT scan and cervical spine x-ray taken on May 21. Doc. No. 92 at 88-9.  Smith reiterated her earlier symptoms to Scott and reported that they had partially improved between her release from the hospital on May 20 and prior to the incident in the bathtub that morning. Id. at 89-90. Regarding her symptoms on May 26, Smith related to Scott that she had severe tailbone pain,

generalized pain, neck stiffness, and a pounding or "whooshing" in her ears, but no headache. Id. at 94-5.

Scott conducted an examination of Smith and observed that her back was tender, that she was unable to flex or extend her back or neck without pain, and that she could not turn her head to the right without experiencing severe pain. Pl. Ex. 2 at 28; Doc. No. 92 at 90. Defendant's expert Diane Sixsmith, who runs an emergency room in a hospital in New York, would later testify that that the head and back pain experienced by Smith on May 26 was likely from "blood migrating into her cerebrospinal space and causing irritation up and down her spinal cord." Doc. No. 94 at 22. However, Scott believed that given his examination and Smith's prior test results, her condition was related to complications from her fall from the toilet on May 20, and was not serious or life-threatening. Doc. No. 92 at 90-1; Doc. No. 93 at 31, 46. He later admitted that he never formed a "comprehensive" differential diagnosis as to Smith's possible conditions. Doc. No. 104-2 at 14. At trial, Scott testified that he did not suspect Smith was suffering from a subarachnoid hemorrhage because a patient who has suffered a syncopal episode (fainting or passing out) from such a hemorrhage would have lost enough blood to be evident on a CT scan, and Smith's medical record indicated that the scan performed on May 21 was unremarkable. Doc. No. 92 at 90-1. Nor did he order a follow-up CT scan or a lumbar puncture. Instead, he prescribed Flexeril, an antispasmodic medication, along with Ultram to help Smith manage her pain. Pl. Ex. 2 at 28-9; Doc. No. 92 at 90-2. Because it was Memorial Day and the VA pharmacy was closed that day, Scott also gave Smith an injection of Toradol, an intravenous form of medicine that provides morphine-like relief. Pl. Ex. 2 at 9; Doc. No. 92 at 92. Scott performed no further tests on Smith, and she was discharged less than an hour later. Pl. Ex. 2 at 26.

8

After Smith's discharge from the VA on May 26, her symptoms once again receded in part. However, on May 31, she complained to her husband of pressure in her ears and eyes, and went to Mainline Medical Associates, an urgent care facility in Cresson, Pennsylvania, for further examination. Doc. No. 93 at 32; Pl. Ex. 4. The physician's assistant there noted her recent history at the VA and prescribed antibiotics for a possible sinus infection. Pl. Ex. 4; Doc. No. 93 at 32. The staff at Mainline Medical Associates took no further action.

The following morning, June 1, Smith and her husband were at home. As Daniel Smith did yard work, Smith sat on the back porch drinking a cup of coffee. Doc. No. 93 at 32-3. While Smith was still on the porch, Daniel Smith walked around to the side of the house to use a faucet to rinse sand off his hands. When he returned to the back of the house, he discovered Smith passed out on the porch in a pool of her own vomit. Doc. No. 93 at 33. After screaming her name several times and unsuccessfully attempting to rouse her, Daniel Smith called 911 for emergency assistance. Id. When emergency personnel arrived, they examined her and informed Daniel Smith that they would need to transport her to Bon Secours Medical Hospital in Altoona, Pennsylvania. Id. At some point prior to the ambulance's departure from the Smith household, Smith regained consciousness and spoke with Daniel Smith and her mother. Id.

When Smith arrived at Bon Secours, she was given an immediate CT scan, which revealed that she had significant bleeding in her brain. Doc. No. 93 at 34; Pl. Ex. 5. At trial, Plaintiff's expert Theodore Schwartz, M.D. explained that Smith's June 1 CT scan was indicative of hemorrhaging into the ventricles of her brain, along with a right to left shift of the midline structures in the front of the brain, and surrounding edema. Doc. No. 101 at 15-6; Pl. Ex. 5 at 14. Throughout her brief stay at Bon Secours, Smith drifted in and out of consciousness, but she was awake when a doctor informed her and her husband that there was blood on her

9

brain and that she would need to be immediately flown to Pittsburgh for emergency surgery. Doc. No. 93 at 34. At that point, Smith responded "that is not good... you know, that's not good." Id. at 35. A few minutes later, Smith looked at her husband, who later described that she looked like she was being "sucked away", and lost consciousness for the last time. Id. At 4:35 p.m. that afternoon, Smith arrived by helicopter at UMPC Presbyterian Hospital in Pittsburgh, where she received immediate treatment to relieve the pressure on her brain, in anticipation of surgery. Pl. Ex. 6 at 3; Doc. No. 101 at 19-20. The following day, doctors at UMPC Presbyterian operated on Smith and repaired the aneurysm; however, the procedure was too late to prevent the significant brain damage already caused. Doc. No. 101 at 16-19. On the morning of June 4, a doctor at UMPC Presbyterian met with Daniel Smith, showed him x-rays of Smith's head and explained that her brain had already started dying. Doc. No. 93 at 35. The doctor added that her situation was "hopeless". Id. Shortly thereafter, Daniel Smith signed papers to have his wife removed from life support, and she died at 11:17 p.m. that evening. Id. at 45. Smith's official cause of death was brain death caused by aneurysmal subarachnoid hemorrhage. Doc. No. 101 at 19-20; Pl. Ex. 7 at 7.

Although the tragedy of Smith's death at a relatively early age affected many people, the most immediate concern was her son, Brandon McCain. Daniel Smith testified as to his belief that Brandon was aware that his mother was gone. Doc. No. 93 at 37. In addition, Mary Ann Smith had been Brandon's primary caretaker for his entire life, and this necessary level of care required by Brandon has not diminished since Smith's death. Doc. No. 92 at 113. Although Brandon can be left alone for a few minutes at a time, he cannot be left unattended for longer periods, such as hours or days. Doc. No. 93 at 18. Despite attempting to preserve a paying job while caring for Brandon, Daniel Smith found that doing so was well beyond his capacities, as

10

Brandon requires full-time care.   Id. at 38-9; Doc. No. 74 at 2.   Consequently, Brandon's biological father, Timothy McClain, who now resides in North Carolina, assumed responsibility for Brandon's care. Doc. No. 92 at 104; Doc No. 93 at 37.   McClain also struggled to provide Brandon the care he needed, but was able to locate a non-profit facility, Holy Angels, in Belmont, North Carolina, that specializes in caring for people with disabilities as severe as Brandon's. Doc. No. 92 at 104.  The facility has a registered nurse on duty 24 hours a day, as well as a doctor on call at all times. Id. at 115. After visiting Holy Angels and conferring with staff, McCain had Brandon admitted on August 18, 2008, and he remains there to this day.  Since entering Holy Angels, Brandon's physical condition has improved.  He has grown two inches and gained 10-15 pounds. Id. at 117. In addition, he has experienced increased mobility and has developed positive relationships with several members of the staff. Id.; Doc. No. 93 at 86, 104. However, it is Daniel Smith's belief that Brandon is not as happy at Holy Angels as he was living with his mother and Daniel Smith.  Doc. No. 93 at 40.  Defense expert Dr. Edward Hoffman also conceded that despite the apparent improvement in Brandon's physical condition, Hoffman would never suggest that Brandon is better off at Holy Angels than he would be with his mother. Doc. No. 94 at 104.

Neither Timothy McClain nor Daniel Smith is billed for the cost of Brandon McClain's stay at Holy Angels. Doc. No. 92 at 120. McClain makes occasional donations to the facility, but these are not mandatory and they are only a small fraction of the costs of Brandon's care. Id. at 122. There was no testimony as to how much money Holy Angels expends in taking care of Brandon, but it receives significant federal government and state funding through Medicaid. At trial, Defendant introduced evidence that the federal government provides 64.71% of the Medicaid funds expended by the state of North Carolina. Doc. No. 94 at 132; Def. Ex. H.  Also

during trial, Plaintiff introduced testimony from B.A. McGettigan, a life care planner, that the combined cost of Brandon's nursing care, case management, and other miscellaneous services is $84,760 per year in current dollars. Doc. No. 100 at 12-13; Pl. Ex. 28. Brandon McClain remains in Holy Angels to this day, where he is visited on a regular basis by Timothy McClain's family. Doc. No. 92 at 118-9.

## III. CONCLUSIONS OF LAW

### A. The Federal Tort Claims Act and Pennsylvania Law

Plaintiff's claims are brought under the Federal Tort Claims Act, which provides for suits against the United States for certain tort claims, and makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Before bringing a claim pursuant to the FTCA, a potential claimant must first file a claim with the administrative agency allegedly responsible for his or her injuries. 28 U.S.C. § 2675(a). Once the agency denies the claim or fails to resolve it within six months, the claimant may then file suit in a federal district court, which has exclusive jurisdiction over FTCA claims. 28 U.S.C. § 2675(a), 28 U.S.C. § 1346(b). In this case, there is no dispute that Plaintiff properly followed this procedure. Plaintiff first filed the appropriate claim with the Department of Veterans Affairs on February 26, 2009, and as of September 21, 2009 – the date of Plaintiff's filing of the Complaint in the instant case – the Department of Veterans Affairs had provided no response.

Suits under the FTCA are governed by state law. 28 U.S.C. § 1346(b); *Santos ex rel. Beato v. U.S.*, 559 F.3d 189, 193 (3d Cir. 2009). Under Pennsylvania law, medical malpractice is "a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act." *Quinby v. Plumsteadville Family Practice, Inc.*,

12

907 A.2d 1061 (Pa.2006) (citing *Mutual Ben. Ins. Co. v. Haver,* 725 A.2d 743 (Pa.1999);

*Hodgson v. Bigelow,* 7 A.2d 338, 342 (Pa.1939). To prevail in a medical malpractice action in

Pennsylvania, a plaintiff must establish the elements for negligence, namely 1) a duty owed by

the physician to the patient, 2) a breach of that duty by the physician, 3) that the breach was the

proximate cause of the harm suffered, and 4) the damages suffered were a direct result of the

harm. *Quinby*, 907 A.2d at 1070-1. Stated differently, "[t]he fundamental issue in medical

malpractice cases... is whether the defendant violated the applicable standard of care and, if so,

whether that violation resulted in injury to the plaintiff." *Pringle v. Rapaport*, 980 A.2d 159, 173

(Pa.Super.2009). Expert testimony is generally required in a medical malpractice action to

establish the proper standard of care, the defendant's failure to exercise that standard of care, and

the causal relationship between the failure to exercise the standard of care and the plaintiff's

injury. *Freed v. Geisinger Medical Center*, 971 A.2d 1202, 1206 (Pa. 2009).

Regarding the duty, or standard of care, owed by a physician to a patient, a non-specialist

physician is "required to possess and employ in the treatment of a patient the skill and

knowledge usually possessed by physicians in the same or a similar locality, giving due regard to

the advanced state of the profession at the time of the treatment." *Joyce v. Boulevard Physical*

*Therapy & Rehabilitation Center, P.C.,* 694 A.2d 648, 654 (Pa.Super.1997) (quoting *Donaldson*

*v. Maffucci,* 156 A.2d 835, 838 (Pa.1959). In employing such skill and knowledge, the physician

is also required to exercise the care and judgment of a reasonable man. Id. A physician whose

conduct falls below the standard of care is negligent. *Pringle*, 980 A.2d at 170. Physicians who

profess to be specialists are held to a higher standard of care than a general practitioner when the

specialist is acting within his or her specialty. *Winschel v. Jain,* 925 A.2d 782, 797

(Pa.Super.2007). The specialist "is expected to exercise that degree of skill, learning and care

13

normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty." *Id.* (quoting *Joyce*, 694 A.2d at 654).

Under Pennsylvania law, a defendant is liable if his negligent conduct was a factual cause of the harm to the plaintiff. *Harris v. Kellogg, Brown & Root Services, Inc.*, 796 F.Supp.2d 642, 659 (W.D.Pa. 2011) (citing Pa. SSJI (Civ), § 3.15). To be a factual cause, "the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." Pa. SSJI (Civ), § 3.15. Defendant's conduct need not be the only factual cause, and the existence of other factual causes does not necessarily relieve the defendant from liability. *Harris*, 796 F.Supp.2d at 659. Even had the harm occurred without the defendant's actions, the defendant is responsible if his negligent conduct was a factual cause of the harm. *Id.* It is the plaintiff's burden to prove by a preponderance of the evidence that the harm suffered was due to the conduct of the defendant. *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978).

## B. Negligence of Physicians Responsible for Mary Ann Smith's Care

At trial, the Court heard testimony as to the potential negligence of three physicians – Mohammed Dowlut, Scott Marlowe, and Robert Scott – who provided care to Mary Ann Smith between May 19, 2008, when she first presented to the Altoona VA, and June 4, 2008, the day of her death. The Court will address the responsibility of each of these physicians for Smith's injuries and death in turn.

### 1.  Negligence of Mohammed Dowlut, M.D.

Dr. Mohammed Dowlut provided emergency room care to Mary Ann Smith on May 19, 2008, under a contract between Annashae Corporation and the VA. Defendant argues that Dowlut breached the standard of care in four ways: 1) failing to obtain an immediate CT scan of Smith's head after consulting with her on May 19, 2008; 2) failing to order a lumbar puncture of Smith's spine once the CT scan was read as negative by Marlowe; 3) failing to obtain a neurological consultation for Smith; and 4) failing to arrange for Smith's admission to the hospital. Doc. No. 107 at 8. Plaintiff concedes that Dowlut's treatment of Smith fell below the standard of care for emergency room physicians, but nevertheless contends that Dowlut's negligence was not a direct or substantial factor in Smith's death. Doc. No. 105 at 68. At trial, Plaintiff challenged each of Defendant's contentions as to whether Dowlut's conduct fell below the standard of care.

### a.  Standard of Care – Emergency Room Physician

Regarding the standard of care owed by emergency room physicians, the Court heard expert testimony from Diane Sixsmith, Chairman of the Department of Emergency Medicine, New York Hospital Queens. Doc. No. 94 at 2. The hospital's emergency room sees 125,000 patients per year, and approximately 350-400 per day.[1] Id. at 5. Sixsmith received her M.D. from the University of Pittsburgh in 1973 and has over 35 years of experience working in emergency room settings. Id. at 3. She is currently certified in both internal medicine and emergency medicine. Id. at 4. Sixsmith's current position renders her responsible for the

---

[1] At trial, Plaintiff attempted to distinguish Sixsmith's experience in emergency medicine in a major metropolitan hospital from the standard of care expected in a much smaller facility like the VA. Doc. No. 94 at 37, 50. However, the Court accepts Sixsmith's premise that the standard of care for emergency medicine for either facility is the same, and if the VA did not have the capacity to meet the standard of care – e.g., providing a CT scan for Smith on the afternoon or evening of May 19 – the doctor on duty was required to "transfer the patient to a facility where that capability is." Id.

administration of the hospital's emergency room, which includes supervising and evaluating the performance of approximately one hundred physicians working there. Id. at 2, 5. In addition to these duties, Smith provides 12 to 20 hours per week of staffing to the emergency room, and teaches emergency medicine 5 to 8 hours per week. Id. at 5. Finally, Smith is a peer reviewer of a prominent medical journal on emergency medicine, and has authored or edited numerous articles and book chapters on the subject of emergency medicine. Id. at 7-8. As a whole, the Court found Sixsmith's testimony highly credible and persuasive, especially when juxtaposed with Dowlut's testimony, which, as explained further below, the Court at times found either inconsistent and/or not credible. Sixsmith provided significant and helpful analysis of the standard of care for emergency medicine owed to someone in Mary Ann Smith's circumstances – i.e., for someone suffering from symptoms indicative of aneurysm and/or subarachnoid hemorrhage.

As discussed above, Smith presented to the VA on May 19, 2008 with a variety of symptoms. Upon her arrival, she related to hospital staff that while on a toilet at home, she experienced a tingling in her neck and blurred vision, and passed out. After regaining consciousness, she realized that she had fallen off the toilet, and subsequently vomited and had diarrhea. Shortly afterward, she developed a migraine headache and neck pain. Pl. Ex. 2 at 41. Her fall from the toilet had been so severe that she broke the toilet loose from the floor. Doc. No. 93 at 29. Smith further informed the VA that she had taken migraine medication, which had at least partially alleviated her headache, and inquired as to whether she should come to the hospital for a checkup. Pl. Ex. 2 at 43. After being referred to Dowlut, Smith reiterated her symptoms to him, and Dowlut noted them in her medical chart. Doc. No. 92 at 72, Pl. Ex. 2 at 35-9.

16

At trial, Sixsmith testified that when Smith presented to the VA on May 19, she did so with "quite typical symptoms of a subarachnoid hemorrhage." Doc. No. 94 at 12. Among these were Smith's severe headache, neck pain, and loss of consciousness, along with the fact that her symptoms were "sudden" and "severe". Id. at 12-13. To be sure, during his testimony, Dowlut claimed that Smith's warning signs for subarachnoid hemorrhage were mitigated by the fact that she had a history of migraines and that her headache had been partially alleviated by the time she reached the VA. Doc. No. 92 at 83. However, Sixsmith explained that Smith's description of her headache "is about as close to a thunderclap symptom that I have ever heard of" – in other words, the "textbook" presentation of a "sentinel bleed", or warning sign, for subarachnoid hemorrhage. Doc. No. 94 at 14-16. The fact that Smith's headache had receded by the time she arrived at the hospital could have been reasonably attributed to the dissipation of blood in her spinal cord, which Sixsmith described as typical in such cases. Id at 16. Sixsmith concluded that based on these symptoms, Dowlut "had to assume" that Smith "had a subarachnoid hemorrhage until proven otherwise."[2] Id. at 13. Accordingly, Sixsmith noted that the appropriate standard of care would have required Dowlut to 1) arrange for Smith to have an immediate CT scan, 2) order a follow-up lumbar puncture if the initial CT scan proved negative, 3) arrange for a neurological consultation for Smith, and 4) admit Smith to the hospital for further observation. Id. at 14-15.

---

[2] There was additional testimony provided at trial to suggest that Dowlut should have recognized the strong possibility that Smith was suffering from a subarachnoid hemorrhage on May 19. As already noted, Peggy Hutton, a physician's assistant at the VA, instructed the nurse who took Smith's initial call that Smith should come immediately to the VA emergency room, as Hutton was concerned that Smith's symptoms could have resulted from any one of a number of serious conditions, including a brain aneurysm. Doc. No. 98 at 4-5. Further, while uncorroborated, Daniel Smith's recounting of his conversation with his wife about her visit with Dowlut is enlightening, as it suggests that Smith herself believed that her condition could be a brain aneurysm. Doc. No. 93 at 47.

Sixsmith emphasized that Dowlut's failures can be traced to not properly considering subarachnoid hemorrhage in his differential diagnosis of Smith on May 19. As explained at trial, differential diagnosis is the process whereby physicians evaluate a patient's symptoms to ascertain the most threatening medical scenarios, and then perform appropriate additional examinations or tests to rule out those scenarios. Doc. No. 94 at 52. Sixsmith explained in her testimony that given Smith's symptoms on May 19, Dowlut was obligated to include subarachnoid hemorrhage in his differential diagnosis. Id. at 20. For his part, Dowlut insisted during his testimony that he had considered the possibility of subarachnoid hemorrhage, and some of his actions – notably ordering Smith's initial CT scan – support this. Doc. No. 92 at 79-80. However, during Dowlut's August 11, 2010 deposition, portions of which were played at trial by Defendant for impeachment purposes, Dowlut seemed unable to explain the concept of differential diagnosis, or whether subarachnoid hemorrhage was ever strongly considered as a possibility. Doc. No. 104-1 at 11-13.

Given Dowlut's insufficient lack of concern about a possible subarachnoid hemorrhage, Defendant argues that he violated the standard of care by failing to get an immediate CT scan of Smith's head when she presented to the hospital on May 19. Again, the Court finds persuasive Sixsmith's testimony that based on Smith's symptoms both prior to and when presenting at the VA, the standard of care for an emergency room physician would have been to perform a CT scan immediately, or arrange for Smith's admission to a facility that had such a capability. Doc. No. 94 at 14, 37-8, 50. This is because the longer a patient with a subarachnoid hemorrhage waits to have such a test performed, the risk increases that the condition will not properly be identified. Id. at 15, 42. By his own admission, Dowlut did not arrange for an immediate CT scan of Smith's brain on May 19. However, he insisted that he prescribed the scan, but allowed

18

Smith to have it performed the next day, instead of having her admitted to the hospital, as she wished to go home for the night to take care of her son Brandon.  Doc. No. 92 at 78-80.

Regardless of whether the Court accepts this explanation, it is telling that in his deposition testimony, Dowlut indicated that he was "not aware" of the principle that CT scans should be performed within 12 hours of a suspected bleed to be most effective in diagnosing potential problems.  Doc. No. 104-1 at 25.  Indeed, Dowlut was under the impression that it would take "several days" for blood in the brain to dissipate sufficiently to cause a false negative on a CT scan.  Id.  This stands in stark contrast to Sixsmith's much more persuasive testimony about the importance of expeditious CT scans.  And even if the appropriate staff and/or capacity was unavailable at the VA on May 19 to perform the CT scan, Dowlut admitted at trial that he could have had the test done that day at another hospital in case of an emergency.  Doc. No. 92 at 83.  Accordingly, the Court finds that Dowlut violated the standard of care by not arranging for an immediate CT scan of Smith's head, either at the VA or another suitable facility.

Defendant next contends that Dowlut violated the standard of care by failing to order a lumbar puncture of Smith's spine once the CT scan was read as negative by Dr. Marlowe.  As Sixsmith convincingly testified at trial, once Dowlut learned that Marlowe had read Smith's CT scan as an "unremarkable study", he still had the duty to order a lumbar puncture, or spinal tap, to determine whether there was blood in Smith's cerebrospinal fluid.  Doc. No. 94 at 14.  Sixsmith further explained that performing a lumbar puncture "is an essential function of an emergency room physician", in part because of the possibility of a "neurological event" similar to the one Smith was experiencing on May 19.  Id. at 30-1.  As already noted, a lumbar puncture would have been important in Smith's case because CT scans can occasionally yield false negatives.  Id. at 14.  Consequently, a lumbar puncture is necessary "because of the tremendous

19

potential for disability or death" in such circumstances. Id. at 52. Figures varied at trial as to what percentage of CT scans provide such "false negative" results, but based on testimony, anywhere from two to ten percent of such scans can be misleadingly false, with presumably some portion of those false negatives occurring when bleeding is present.[3] Dowlut never ordered such a test, even after reviewing Smith's CT scan results three days later. Doc. No. 92 at 74, 77, 84-5. Although Dowlut was not on duty when the CT scan results came in, he did review her medical file three days later and ordered no follow-up procedures, despite Smith's acute symptoms. Doc. No. 94 at 40-1. Accordingly, the Court finds that Dowlut fell below the standard of care by not ordering a lumbar puncture for Smith after her CT scan had been read as negative.

Finally, Defendant argues that Dowlut was negligent in failing either to obtain a neurological consultation for Smith or admit her to the hospital on May 19. Given Smith's immediate symptoms and her history of migraines, Sixsmith testified, Smith needed a neurological consultation on May 19. Doc. No. 94 at 15. Dowlut never ordered such a consultation, but insisted at trial that he gave Smith a "neurological examination" when she arrived at the hospital. Doc. No. 92 at 78. However, there is a presumable difference between a baseline neurological examination performed by an emergency room physician like Dowlut, and a more thorough neurological consultation performed by a specialist. Dowlut never ordered the latter, and there is no indication from the trial record that it was ever considered. Regarding admission to the hospital, as already noted, Dowlut testified at trial that he offered to admit to the

---

[3] To be sure, Plaintiff helpfully suggested during Sixsmith's cross-examination that the scanner available at the VA was a newer model, and thus less subject to false negatives than older scanners which were the subject of studies presumably referenced by Sixsmith in her testimony. Doc. No. 94 at 44. However, regardless of whether the VA scanner was more accurate than older scanners, there is no evidence to suggest that the reduction of false negatives in such cases has in any way modified the standard of care in cases of possible subarachnoid hemorrhage when an initial CT scan is read as negative.

hospital pending her scheduled CT scan the following morning, but Smith declined so that she could return home and care for her son Brandon. Id. Based on the trial record, the Court accepts that Dowlut did discuss the possibility of Smith staying in the hospital overnight, but is highly skeptical as to how sufficiently he explained to her the importance of doing so. The lack of documentation in Smith's hospital record as to a conversation between her and Dowlut is telling; presumably, a physician will document when a patient acts against specific medical advice. Id. at 82; Doc. No. 94 at 19. As Sixsmith testified, such documentation is important to demonstrate that "the risks and benefits were made clear" to Smith before her discharge. Doc. No. 94 at 18. Given paltry evidence of any such conversation in the medical record, the Court is skeptical of Dowlut's claims that he sufficiently explained any risks to Smith before her discharge on May 19. Accordingly, the Court finds that Dowlut violated the standard of care both by failing to obtain a neurological consultation for Smith and not having her admitted to the hospital on May 19.

### b. Causation

The Court further finds that Dowlut's negligence led to Smith's injuries and death in two ways. First, Dowlut's failure to obtain a lumbar puncture after Smith's negative CT scan was a second missed opportunity to diagnose and ultimately treat her condition. Sixsmith testified that a positive lumbar puncture could have identified the presence of blood in Smith's cerebrospinal fluid, thus alerting physicians to her condition. Doc. No. 94 at 14. And as Plaintiff's expert Theodore Schwartz testified, the window of opportunity to save Smith's life was open from her first presentation to the VA on May 19 through June 1, when her aneurysm ultimately ruptured. Doc. No. 101 at 21. Second, although Dowlut gave Smith a neurological exam, his failure to

refer her to a neurologist or neurosurgeon was yet another missed opportunity for a trained specialist to properly diagnose her symptoms. Doc. No. 94 at 14.

However, Smith's failure to arrange for an immediate CT scan of Smith's head cannot be said to have been a proximate cause of her injuries and death. What failed was not the CT scan itself – as will be made clear below, Marlowe ultimately failed to see what was clearly before him, namely, a CT scan that showed that Smith was suffering from a potential subarachnoid hemorrhage. Plaintiff's expert Michelle Whiteman explained that, even though an earlier CT scan would have provided an "even more abnormal" result than what Marlowe eventually viewed, the scan available to Marlowe was still "unquestioningly abnormal". Doc. No. 92 at 51, 63. Nor is it clear how admission to the hospital on the evening of May 19 would have prevented Smith's death, as there was no testimony regarding any additional symptoms experienced by Smith that night that may have alerted a physician to the possibility of subarachnoid hemorrhage.

Finally, the Court finds that all of the categories of damages set forth by Plaintiff in the Complaint were a direct result of the harm inflicted by Dowlut. The percentage apportionment of these damages will be discussed further below, but the Court notes that Plaintiff's death-related expenses, past non-economic damages and future non-economic damages under the Wrongful Death Act, as well as past lost earnings, future lost earnings, and past non-economic damages (i.e., pain and suffering) under the Survival Act are all partially attributable to Dowlut's negligence.

### 2. Negligence of Scott Marlowe, M.D.

Dr. Scott Marlowe, a radiologist and employee of the United States, was on duty at the VA on May 20 when Smith returned to the hospital that morning and underwent a CT scan of her head. That same day, Marlowe read Smith's CT scan and reported that it was an "unremarkable study". Doc. No. 93 at 2-3; Pl. Ex. 2 at 6-8. Smith telephoned the VA on May 21 for the results, and was informed of Marlowe's conclusions by a nurse. Pl. Ex. 2 at 32-3. Plaintiff argues that Defendant, through its employee Marlowe, is liable to Plaintiff for Marlowe's negligent treatment of Mary Ann Smith when he misread her CT scan. Doc. No. 105 at 68. Defendant presented no serious challenge as to Marlowe's violation of the standard of care at trial, but instead focused on the contribution of Dowlut and Scott to Smith's injuries and eventual death. Doc. No. 107 at 8-9, 12. Defendant also argues that to the extent that Marlowe may have been negligent, such negligence was not a substantial factor or cause in Smith's death. Id. at 24.

### a. Standard of Care - Radiology

At trial, Plaintiff presented testimony from two experts, Dr. Michelle Whiteman and Dr. Mitchell Whiteman, as to the standard of care owed by a radiologist to a patient in Mary Ann Smith's circumstances. Michelle Whiteman, a neuroradiologist from Florida, testified on the first day of trial. She earned her medical degree at Albany Medical College and is board certified in radiology with an additional specialization in neuroradiology. Doc. No. 92 at 39-40. Mitchell Whiteman's testimony was presented via his January 24, 2012 videotaped deposition. Whiteman is a radiologist at the Weston Cleveland Clinic in Florida. He earned his medical degree from Thomas Jefferson University College of Medicine and is board certified in radiology. He has over twenty years of experience as a radiologist. Doc. No. 102 at 4-6. As a whole, the Court found both Michelle Whiteman's and Mitchell Whiteman's respective

23

testimony informative and persuasive in explaining the standard of care owed by a radiologist in the circumstances faced by Marlowe on May 20.

Plaintiff's experts convincingly testified that Smith's May 20 CT scans were strongly, if not overwhelmingly, indicative of the presence of blood in Smith's brain. Michelle Whiteman reviewed Smith's CT scan images, which were displayed before the Court, and testified that Smith's CT scan was "definitely abnormal" and certainly not "an unremarkable study" as described by Marlowe. Doc. No. 92 at 44; Pl. Ex. 3. She explained that multiple "slices" of the scan revealed little to no evidence of certain brain structures known as sulci, which normally contain cerebrospinal fluid. Their absence on the scan was almost certainly due to edema or the significant presence of blood in Smith's brain. Doc. No. 92 at 47-50. Other brain landmarks, known as sylvian fissures, were also absent from the scan. Id. at 48-9. As Whiteman described, this would have been a clear sign to a radiologist that there was something wrong. Id. at 47. These signs were indicative of a possible subarachnoid hemorrhage – the condition that Smith was suffering from at the time of the CT scan. Id. at 53-7. As Whiteman explained, "this is the way radiologists see subarachnoid hemorrhage on a scan... we see the reaction of the brain by obliteration or effacement of the normal sulci, which are the normal structures that we would expect to see." Id. at 56. In addition, Whiteman observed that numerous areas in the scan images were "consistent and suspicious for hemorrhage." Id. at 57. Accordingly, she concluded that Marlowe fell below the standard of care by not recognizing the clear signs of subarachnoid hemorrhage presented by Smith's CT scan. Id. at 62.

Michelle Whiteman's findings were largely confirmed by Mitchell Whiteman in his videotaped deposition testimony. He explained that by the time a patient reaches 40 years of age, sulci should be apparent on a CT scan. Doc. No. 102 at 11. The fact that Smith's sulci were

24

effaced in her scan should have been recognized as a sign of a medical problem. Id. at 13, 15. Also suspicious was that some of the CT scan images were asymmetric. Id. at 19-20. Whiteman stated that the CT scans demonstrated "significant brain edema and... areas of hyperdensity very suspicious for subarachnoid hemorrhage." Id. at 27. Neither of these possibilities were identified by Marlowe in his report. Whiteman concluded that Marlowe fell below the standard of care by reporting Smith's CT scans as unremarkable. Id. at 28.

Both Michelle Whiteman and Mitchell Whiteman also testified that Marlowe violated the standard of care by failing to take additional action once he had reviewed the films. Doc. No. 92 at 62, Doc. No. 102 at 28. As Mitchell Whiteman explained, Smith's CT scan results represented an "emergency" which required an immediate phone call to the primary physician or a neurologist to inform him or her of the possibility of subarachnoid hemorrhage. Doc. No. 102 at 29-30. Michelle Whiteman agreed that Smith's CT scans should have triggered "an immediate phone call, because this is a neurosurgical emergency. This is one of... the dreaded things that comes in when someone has a headache." Doc. No. 92 at 60-1. Again, Marlowe took none of these actions.

Given the convincing testimony of both Michelle and Mitchell Whiteman, and with the understanding that no contradicting testimony was presented by Defendant, the Court finds that Marlowe breached the standard of care for radiologists by 1) failing to accurately observe and report the clear signs in Smith's CT scan that she was suffering from subarachnoid hemorrhage and/or some equally life-threatening condition, and 2) failing to take additional action once it should have been apparent that Smith's health and life were in jeopardy. As noted above, this was not a situation that should have been a "close call" for a radiologist in Marlowe's position.

25

Rather, based on expert testimony, Smith's CT scan presented the textbook case of warning signs for a subarachnoid hemorrhage.

### b. Causation

The Court also finds that Marlowe's breach of the standard of care was the proximate cause of the harm suffered by Mary Ann Smith. The Court was particularly impressed with the January 25, 2012 videotaped deposition testimony of Plaintiff's expert Theodore H. Schwartz, a neurosurgeon at New York Presbyterian Hospital. Schwartz, who earned his degree at Harvard Medical School, is board certified in neurosurgery and has taught neurosurgery for over ten years. Doc. No. 101 at 4-5. He has also authored or edited numerous articles in the field of neurosurgery. Id. at 5. Schwartz testified that in cases similar to Smith's where a brain aneurysm is present, two different procedures – "coiling" and "clipping" – are available to repair the aneurysm, prevent subsequent hemorrhage, and save the patient's life. Id. at 9-10. One of these procedures – coiling – was employed to seal off the ruptured aneurysm in Smith's head after her June 1 collapse, but by this point, significant brain damage had already occurred. Id. at 13- 16. Smith's brain hemorrhage also led to strokes, which caused additional damage. Id. at 17. And because Smith's aneurysm likely did not rupture until June 1, an opportunity existed from May 19 to June 1 for Smith to be treated and live a normal life. Doc. No. 101 at 21. Accordingly, Schwartz testified, the failure to diagnose and treat Smith's condition was a factual cause of her death on June 4, 2008. Id. at 21.

Ultimately, it was Marlowe's negligence that set in motion a chain of events that ensured that Smith never received the care she needed for her subarachnoid hemorrhage. As discussed further both above and below, while Dowlut and Scott's negligence also contributed to Smith's death, both would have taken a different course of action had Marlowe properly reported the

results of Smith's CT scan. Dowlut, who read Marlowe's report but not the films, testified that had Marlowe's report indicated the possibility of subarachnoid hemorrhage, he would have immediately referred her to a neurosurgeon. Doc. No. 92 at 77. Similarly, Scott testified that had the CT scan been reported as suspicious for subarachnoid hemorrhage, Smith "would have been flown to a tertiary care center. I would have called a helicopter and got her out of there." Id. at 96. Both Dowlut and Scott's testimony correlated with the testimony of Michelle Whiteman, who noted that when Marlowe read Smith's CT scan, there was a window of opportunity to intervene and save her life. Id. at 57, 61. Essentially, Marlowe was the most important line of defense for Smith, and his failure significantly hindered the possibility that Smith's condition would be properly diagnosed.

Finally, the Court finds that all of the categories of damages set forth by Plaintiff in the Complaint were a direct result of the harm inflicted by Marlowe. The percentage apportionment of these damages will be discussed further below, but the Court notes that Plaintiff's death-related expenses, past non-economic damages and future non-economic damages under the Wrongful Death Act, as well as past lost earnings, future lost earnings, and past non-economic damages (i.e., pain and suffering) under the Survival Act are all significantly attributable to Marlowe's negligence.

### 3. Negligence of Robert Scott, M.D.

As already discussed, Dr. Robert Scott provided emergency room care to Mary Ann Smith on May 26, 2008, under a contract between Annashae Corporation and the VA. Defendant argues that Scott breached the standard of care in four ways: 1) failing to order a repeat CT scan of Smith's head; 2) failing to perform a lumbar puncture; 3) failing to obtain a neurological consultation for Smith; and 4) failing to arrange for Smith's admission to the

27

hospital. Doc. No. 107 at 12. Plaintiff contends that Scott's conduct did not fall below the standard of care. Doc. No. 105 at 68.

### a. Standard of Care – Emergency Room Physician

In evaluating Scott's care of Smith, the Court first emphasizes that Scott had the benefit of both observing Smith's symptoms on May 26, as well as reviewing her full medical file, including her visit with Dowlut on May 19 and the results of her May 20 CT scan. Doc. No. 92 at 88-9. During her visit to the VA on May 26, Smith related to Scott that she had attempted to take a bath that morning and experienced extreme pain in her tailbone while sitting down in the tub. Pl. Ex. 2 at 28-9. Smith also experienced heaviness in her arms, neck spasms, and a "whooshing" sound in her ears. Id; Doc. No. 93 at 31, 43-4; Doc. No. 92 at 94-5. Smith further told Scott that her earlier symptoms, as reported to Dowlut on May 19, had improved between her release from the hospital and prior to the incident in the bathtub that morning. Doc. No. 92 at 89-90. Scott conducted an examination of Smith and observed that her back was tender, that she was unable to flex or extend her back or neck without pain, and that she could not turn her head to the right without experiencing severe pain. Pl. Ex. 2 at 28; Doc. No. 92 at 90. Nevertheless, Scott believed that her condition was related to complications from her fall from the toilet on May 20, and was not serious or life-threatening. Doc. No. 92 at 90-1; Doc. No. 93 at 31, 46. He later admitted that he never formed a "comprehensive" differential diagnosis as to Smith's possible conditions. Doc. No. 104-2 at 14. As Sixsmith noted at trial, many of Scott's conclusions about Smith's condition were questionable, as some of her symptoms had been exacerbated by May 26, and were not getting better. Doc. No. 94 at 21.

There was no suggestion at trial that Scott ever strongly considered arranging a second CT scan for Smith, even though he had the capacity to do so. Doc. No. 92 at 97. Therefore, the

question is whether it was Scott's duty to order such a scan. Once again, the Court found Diane Sixsmith's testimony in this area convincing. She asserted that when Scott evaluated Smith's fresh symptoms on May 26, and given both her prior symptoms and the further possibility of a false negative CT scan, a subarachnoid hemorrhage "was still the leading diagnosis." Doc. No. 94 at 24. Essentially, the VA staff was given an additional valuable opportunity to identify Smith's problem when she presented on May 26; a second CT scan would almost certainly have diagnosed subarachnoid hemorrhage. Yet despite Scott's full review of the records, a CT scan was never ordered. Instead, he prescribed Flexeril, an antispasmodic medication, along with Ultram to help Smith manage her pain. Pl. Ex. 2 at 29; Doc. No. 92 at 90-2.

Nor did Scott take another step toward ruling out the serious possibility of subarachnoid hemorrhage – namely, ordering a lumbar puncture for Smith. Just as was the case for Dowlut, Sixsmith noted that given the many unanswered questions about Smith's condition on May 26, Scott had the obligation to perform a lumbar puncture on Smith to ascertain whether there was blood in her cerebrospinal fluid. Doc. No. 94 at 24-5. For his part, Scott testified that none of his colleagues have ever performed a lumbar puncture for someone who has passed out and had a normal CT scan, as a brain bleed in such circumstances would have had to have been detected on the CT scan, and the reported results of Smith's scan were unremarkable. Doc. No. 92 at 90-1, 95. However, in her testimony, Sixsmith stated that she had "no idea" how Scott may have come to such a conclusion, and further asserted that there is nothing in medical literature to suggest it. Doc. No. 94 at 43-4. And Scott's trial testimony on this issue is rendered suspect by his August 11, 2010 deposition testimony, in which he clearly stated that when an emergency room physician suspects a patient is suffering from a subarachnoid hemorrhage, "[y]ou always start with a noncontrasted CT scan, because it is the most benign test. And if that is negative, a

lumbar puncture is then indicated." Doc. No. 104-2 at 25-6. Accordingly, the Court accepts Sixsmith's conclusions that Scott breached the standard of care by both failing to order a second CT scan and absent that, failing to perform a lumbar puncture on Smith's spine.

Defendant also argues that Scott was negligent by failing to obtain a neurological consultation and failing to have Smith admitted to the hospital. Sixsmith testified that the standard of care for this situation required Scott to do so. Doc. No. 94 at 24. Scott testified at trial that he did not seriously consider a neurological problem given Smith's symptoms on May 26. Doc. No. 92 at 95-6. However, he had access to Smith's medical records, which as already noted, strongly suggested neurological issues only a week earlier. Accordingly, based on Sixsmith's testimony concerning the full range of symptoms experienced by Smith between May 19 and May 26, the Court finds that Scott was negligent in not arranging for a neurological consultation. For the same reason, the Court is not convinced by Scott's testimony that "it would be very difficult to justify" admitting Smith to the hospital based on her symptoms on May 26. Doc. No. 92 at 96. In his testimony, Scott attempted to minimize these symptoms by saying Smith "ached all over", Doc. No. 92 at 96, but as already demonstrated, the full range of those symptoms was much more complex and alarming. Therefore, the Court also finds Scott negligent in failing to admit Smith to the hospital on May 26.

### b. Causation

The Court finds that Scott's negligence led to Smith's injuries and death in three ways. First, Scott's failure to order a follow-up CT scan represented an additional opportunity to diagnose, and ultimately treat Smith's condition. Similarly, ordering a lumbar puncture of Smith on May 26 would have shed valuable light onto the true nature of Smith's ailment, as the test could have identified the presence of blood in Smith's cerebrospinal fluid, thus alerting

physicians to her condition. Doc. No. 94 at 14. Third, although Scott gave Smith a neurological exam, his failure to refer her to a neurologist or neurosurgeon further prevented her condition being diagnosed. Any one of these actions, within the standard of care for physicians in Scott's position, could almost certainly have saved Smith's life, and Scott's failure to perform all three contributed to Smith's death on June 4. However, as was the case for Dowlut, it is unclear to the Court how admission to the hospital on the evening of May 26 would have prevented Smith's death, as there was no testimony as to any additional symptoms experienced by Smith that night that may have alerted a physician to the possibility of subarachnoid hemorrhage.

Finally, the Court finds that all of the categories of damages set forth by Plaintiff in the Complaint were a direct result of Scott's negligence. The percentage apportionment of these damages will be discussed further below, but the Court notes that Plaintiff's death-related expenses, past non-economic damages and future non-economic damages under the Wrongful Death Act, as well as past lost earnings and future lost earnings under the Survival Act are all partially attributable to Scott's negligence. However, Scott is only liable for past non-economic damages under the Survival Act for Smith's pain and suffering between May 26, when Scott treated her, through June 4, when Smith died.

### 4. Allocation of Liability

Assigning a percentage value to the comparative negligence of multiple parties in a medical malpractice action is by nature an inexact science. The Pennsylvania comparative negligence statute advises courts that "[w]here recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed." 42 Pa.C.S. § 7201(b). In

31

determining to what degree Dowlut's, Marlowe's, and Scott's actions contributed to Plaintiff's damages, the Court begins with the premise that Marlowe was ultimately most responsible for the chain of events leading to Plaintiff's death. Had Marlowe properly read Smith's CT scan on May 20 and prescribed emergency action, Smith would almost certainly have survived the medical emergency that claimed her life on June 4, 2008. Marlowe's failure also exacerbated Dowlut's and Scott's flawed diagnoses of Smith, thus further compounding their negligent care. Regarding Dowlut and Scott, each faced circumstances the other did not. Dowlut had the opportunity to view many of Smith's more acute symptoms firsthand, while Scott had the ability to review all of the symptoms experienced by Smith between May 20 and May 26. As mentioned, both physicians' diagnoses were hindered by Marlowe's faulty CT scan reading, but neither Dowlut nor Scott had the obligation to accept Smith's CT scan at face value and cease employing other diagnostic tools, which is ultimately what both did.

Taking all of these factors into account, the Court finds Marlowe 70 percent liable, Dowlut 15 percent liable, and Scott 15 percent liable for all of Smith's damages, with the exception of pain and suffering under the Survival Act. To the extent that Smith is awarded damages for pain and suffering between May 20 and May 26, 2008, Marlowe is 70 percent responsible and Dowlut is 30 percent responsible. Smith's pain and suffering damages between May 26, 2008 and her death on June 4, 2008 will be apportioned at the ratio of 70 percent for Marlowe, 15 percent for Dowlut, and 15 percent for Scott.

## C. Damages

Plaintiff requests damages under both the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301, and Survival Act, 42 Pa.C.S. § 8302. Pennsylvania law defines wrongful death damages as "the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death." *Rettger v. UPMC Shadyside*, 991 A.2d 915, 933 (Pa.Super. 2010) (quoting *Slaseman v. Myers*, 455 A.2d 1213, 1218 (Pa.Super.1983). Members of the decedent's family may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of her services, including society and comfort. *Rettger*, 991 A.2d at 933. The term "services" includes "the profound emotional and psychological loss suffered upon the death of a parent or child where the evidence establishes negligence of another as its cause." Id. Regarding the Survival Act, damages are measured by the pecuniary loss to the decedent. *Id.* The measure of damages awarded in a survival action include the pain and suffering of the decedent, *Kiser v. Schulte*, 648 A.2d 1 (Pa.1994), as well as lost earnings and lost earning potential. *Gunn v. Grossman*, 748 A.2d 1235, 1241 (Pa.Super.2000).

### 1. Wrongful Death Act

Plaintiff requests that the Court award four categories of damages under the Survival Act – Mary Ann Smith's death-related expenses, Brandon McClain's past damages, Brandon McClain's future damages, and Daniel Smith's non-economic damages. Doc. No. 105 at 69-70.

#### a. Death-related expenses

The parties have previously stipulated that funeral, burial, and memorial expenses for Mary Ann Smith were $7,242.50. Doc. No. 74 at 1. The Court will attribute 70 percent of this amount to Defendant, for a total of **$5,069.75**.

### b. Brandon McClain's past damages

With regard to the cost of medical and related care for Brandon McClain, the Court heard testimony from Plaintiff's expert B.A. McGettigan, a registered nurse and life care planner. McGettigan earned a nursing degree from Thomas Jefferson University Hospital and has been involved in life care planning since 1988. Doc. No. 100 at 3-5. She persuasively testified that Brandon McCain requires significant care and 24-hour supervision, as he cannot independently carry out many of his own essential life functions. Id. at 10. These functions were fulfilled by his mother, but in her absence, Brandon requires a live-in nursing assistant, a skilled nurse to oversee medications, a case manager to oversee his care, and an additional allotment for other miscellaneous activities. Id. at 10-12. McGettigan estimated the yearly cost of Brandon's care at $84,760. Pl. Ex. 28; Doc. No. 105 at 52. Defendant does not challenge this figure. Doc. No. 107 at 19.

Plaintiff's expert David Hopkins, an actuarial economic consultant, testified as to Plaintiff's damages in this case. Hopkins earned a Bachelor of Science degree in economics from the University of Pennsylvania and a master's degree in actuarial science from Temple University. He is an associate of the Society of Actuaries, and member of the American Academy of Actuaries. Hopkins has over twenty years of experience in the actuarial field. Doc. No. 93 at 52-3. The Court generally found his testimony reasonable and persuasive. Given McGettigan's estimates, Hopkins calculated that damages for Brandon's past loss of Mary Ann Smith's services total $243,272. Pl. Ex. 29. Defendant did not specifically challenge this figure, but instead presented evidence to the effect that the United States government funds 64.71% of the North Carolina Medicaid program. Doc. No. 94 at 132-133; Def. Ex. H. Because Medicaid funds are paid from the general fund, Defendant argues that they should be considered "non-

34

collateral" and hence deductible from an award under the FTCA. Doc. No. 107 at 26. Plaintiff objected to the introduction of such evidence at trial, but made no specific argument regarding its use in his Proposed Findings.

Because FTCA claims are subject to state law, the Court employs Pennsylvania's collateral source rule, which permits a tort victim to recover more than once for the same injury in certain cases where these recoveries come from different (i.e., collateral) sources. *Leeper v. United States,* 756 F.2d 300, 303 (3d Cir. 1985). However, the Third Circuit has noted that certain payments already made from the United States general fund are exempt from this rule, as FTCA awards are also paid out of the general fund, thus leading to the potential for improper double recovery. *Feeley v. United States,* 337 F.2d 924, 933-4 (3d Cir. 1964) (holding recovery of VA-paid health expenses not permitted because such damages would be paid out of general fund). Further, numerous federal courts in states with similar collateral source rules have held that Medicaid is not a collateral source, as it is paid out of the general fund. *Mason v. Sebelius,* 2012 WL 1019131 (D.N.J. March 23, 2012); *Waskey v. United States,* 2007 WL 898888 (D.Alaska March 23, 2007); *Lucius v. United States,* 2006 WL 3257915 (E.D.Mo. Nov. 9, 2006). In contrast, because Social Security and Medicare are partially funded by direct deductions from personal income, and not purely allocated from the general fund, they are considered collateral sources under Pennsylvania law and are therefore not prohibited from the double recovery prohibition set forth in *Feeley.* See *Titchnell v. United States,* 681 F.2d 165 (3d Cir. 1982) (holding that trial court properly refused to reduce malpractice damage award to extent of Medicare reimbursement, as Medicare is a collateral source under Pennsylvania law); *Smith v. United States,* 587 F.3d 1013 (3d Cir. 1978) (finding Social Security benefits not deductible from

FTCA award because Social Security is funded almost entirely from employer and employee contributions).

As noted, Defendant produced evidence indicating that the United States government funds 64.71% of the North Carolina Medicaid program. Plaintiff did not challenge the accuracy of this evidence, and given the "general fund" exception to Pennsylvania's collateral source rule, such evidence is admissible. However, this does not end the matter, as it remains unclear what percentage of Brandon's total care is funded by Medicaid. Defendant maintains that Holy Angels receives funds from Medicaid, Social Security Disability, and Medicare. Doc. No. 107 at 28. But no evidence was offered as to what Holy Angels' specific financial allocations were with regard to Brandon's care. And as already noted, Social Security and Medicare funds are exempt from the double recovery prohibition under Pennsylvania law. Because Defendant has not reasonably estimated the amount of general fund dollars which have been previously spent on Brandon McClain's care, the Court declines to allow a set-off for such funds. Accordingly, the Court finds that $243,272 is an appropriate amount for Brandon McClain's past lost services, and will attribute 70 percent of this amount to Defendant, for a total of **$170,290.40**

### c. Brandon McClain's future damages

In addition to requesting damages for Mary Ann Smith's past lost services to Brandon McClain, Plaintiff asks the Court to award damages for such lost services in the future. Hopkins estimated that Smith's life expectancy would have been an additional 40 years from the date of her death on June 4, 2008. Doc. No. 93 at 62. Hopkins further estimated that she would have been generally able to provide care and support for Brandon McClain for the duration of that life span. Id. at 73-4. Finally, Hopkins testified that it would be appropriate to use a "2.5 percent net growth for present value" equation to calculate for the future real value of Brandon McClain's

medical care, as the price of medical care has recently been increasing at a higher rate than the general rate of inflation. Id. at 75-6. Using this equation and based on Smith's life expectancy and McGettigan's estimation of yearly costs, Plaintiff argues that the value of Smith's future lost services to Brandon McClain is $5,063,049. Pl. Ex. 29; Doc. No. 105 at 56.

For its part, Defendant presented the expert testimony of Matthew Marlin, professor and chair of the Department of Economics at Duquesne University in Pittsburgh, Pennsylvania. Marlin has a Ph.D. in economics from the University of Florida at Tallahassee in 1981, and he has been teaching economics and statistics courses for approximately thirty years. Doc. No. 94 at 106-8. Hopkins agreed that Smith had an additional 40 years of life expectancy at the date of her death, but disagreed that she would be able to continue providing home care services to Brandon McClain for the duration of that time. Instead, Marlin argued that it would be more appropriate to assume that Smith could provide these services through her healthy life expectancy, which was 74. Id. at 125. Defendant also presented the expert testimony of Edward L. Hoffman, M.D., a developmental pediatrician. Doc. No. 94 at 54. Hoffman obtained his medical degree from the University of Tennessee in Knoxville and has worked in the field of pediatrics for 25 years. Id. at 54-7. Hoffman testified that based on his own experience and examination of Brandon McClain, he will likely only live to his early fifties. Id. at 69. Therefore, based on both Marlin and Hoffman's estimates, Defendant argues that should the Court award damages to replace Smith's future lost services to Brandon McClain, they should only be extended an additional 31 years beyond her death. Doc. No. 107 at 19-20. In addition, Marlin testified that it is most appropriate to employ a "2.5 net interest for present value" equation when accounting for the future real value of Brandon McClain's medical care. Doc. No. 94 at 125-6. This is because interest rates are historically higher than inflation rates. Id. at

126, 151. Using this equation, Defendant argues that the value of Smith's future lost services to Brandon McClain is $2,757,504. Doc. No. 107 at 20.

Although the Court found the testimony of both of Defendant's experts reasonable, it declines to completely accept their conclusions. Regarding Smith's ability to provide services to Brandon McClain in the future, Marlin's testimony was not based upon McClain's specific needs or the services that Smith actually provided. In addition, Marlin's own writings suggest that household services of the kind that Smith performed may continue throughout a person's lifetime. Doc. No. 94 at 139-40. The Court will accordingly accept the Plaintiff's proposition that Smith's services to Brandon McClain would have continued for the duration of her life expectancy, or an additional 40 years after the actual date of her death.

With regard to Brandon McClain's life expectancy, while the Court recognizes Hoffman's expertise in working with and treating children like Brandon, his estimation of Brandon's life expectancy was not precise, and by his own admission was not based on specific empirical data. Doc. No. 94 at 98-103. Accordingly, the Court accepts that Mary Ann Smith would have continued to provide services to Brandon McClain for an additional 40 years.

Finally, the Court was persuaded by Hopkins' testimony regarding the use of a "2.5 net interest for present value" equation when accounting for the future real value of Brandon McClain's medical care. As Hopkins explained, the price of medical care continues to increase at a rate that is disproportionate to the current inflation rate. Accordingly, the Court finds that $5,063,049 is an appropriate amount for Brandon McClain's past lost services, and will attribute 70 percent of this amount to Defendant, for a total of **$3,544,134.30**.

One matter remains. Defendant argues that it should receive an appropriate set-off from this amount in consideration of its contribution to the North Carolina Medicaid program. Doc.

No. 107 at 20. However, as already indicated, Defendant has produced insufficient evidence to demonstrate exactly what amount from Medicaid will actually go to Brandon McClain's care. And even had Defendant done so, the Third Circuit exception to the Pennsylvania collateral source rule does not apply to future care costs that may come out of the general fund. See *Feeley v. United States*, 337 F.2d 924, 934-5 (3d Cir. 1964) (holding that setting off an FTCA award by the amount of care plaintiff would receive in the future from the VA "would result in forcing the plaintiff, financially speaking, to seek only the available public assistance. Private medical care would be obtained at the plaintiff's own expense. We think that is an unconscionable burden to place on the plaintiff"). In short, Brandon McClain and his caretaker should be provided with the full choice and capacity to obtain the care he needs, both now and in the future. Accordingly, the Court will not provide Defendant with a Medicaid set-off.

However, given the reality that the government is likely already subsidizing a significant portion of Brandon's medical care at Holy Angels, as well as the need to adequately provide for Brandon's future care, the Court is particularly concerned that the aforementioned amount be preserved for that exclusive use. To be clear, the Court does not question the honest intentions of Plaintiff or other potential caretakers to ensure that Brandon receives the same level of care throughout the remainder of his life. But unpredictable circumstances can and do occur, and Brandon's needs must be met regardless of such circumstances. Accordingly, the Court will order that the funds for Brandon's care be placed in a trust for the duration of his life, with a sole reversionary interest to the United States should any funds remain after his death. This means of ensuring that FTCA awards for medical care are properly allocated has been upheld by at least two Circuits. See *Cibula v. United States*, 664 F.3d 428 (4th Cir. 2012); *Hull v. United States*, 971 F.2d 1499 (10th Cir. 1992). As the Fourth Circuit has noted, such a reversionary interest

"eliminates the potential for a windfall without in any way rendering the award less sufficient compensation..." *Cibula*, 664 F.3d at 436. And although the Third Circuit has previously disallowed the establishment of a reversionary trust in an FTCA suit, that case involved a request by the government to establish a trust by which the government might be compelled to make supplementary payments in the future, thus violating the FTCA's mandate that only lump sum judgments shall be awarded. See *Frankel v. United States*, 466 F.2d 1226, 1228-9 (3d Cir. 1972). To avoid this problem, the Court hereby notes as a condition of said reversionary trust that an exclusive one-time payment be made into it from the damages apportioned here. The amount paid will be **$3,544,134.30**, minus the appropriate portion from those funds representing the percentage agreed to by Plaintiff and his attorney for attorney's fees.[4] An appropriate hearing will be held within 20 days of this decision, with submissions considered from the parties, to determine the establishment and administration of the reversionary trust.

### d. Brandon McClain's other damages

In addition to the loss of Mary Ann Smith's caretaking services, the Court also will award Brandon McClain damages for the loss of Mary Ann Smith's society and comfort. By all accounts, Brandon and his mother had a special bond, which cannot be replaced. Determining an exact amount is complicated by the uncertainty of the extent to which Brandon still feels his mother's loss. Nevertheless, based on testimony provided at trial, the Court finds that $50,000 is an appropriate amount for these damages. Of this amount, 70 percent is attributed to Defendant, for a total of **$35,000**

---

[4] Of course, if applicable, this rule applies to all damages in this case, but the Court specifies it here so as to be clear that, presuming such an agreement exists, attorney's fees shall be calculated as a percentage of the **total** damages in this case, unless otherwise specified by Plaintiff and his attorney.

### e. Daniel Smith's non-economic damages

The Court also will award Daniel Smith damages for the loss of Mary Ann Smith's society and comfort. By all accounts, the Smiths had a loving and strong marriage, as evidenced by their ten years together and their raising of Brandon despite his physical and mental handicaps. It is by nature impossible to assign a precise dollar figure in such tragic circumstances, but the Court finds that $100,000 is an appropriate amount for these damages. Of this amount, 70 percent is attributed to Defendant, for a total of **$70,000**.

### f. Total damages under the Wrongful Death Act

Therefore, Plaintiff's total damages under the Wrongful Death Act total $5,463,563.50. Of this amount, Defendant is liable for **$3,824,494.45**.

### 2. Survival Act

Plaintiff requests that the Court award three categories of damages under the Survival Act – Mary Ann Smith's past lost earnings and fringe benefits, Mary Ann Smith's future lost earnings and fringe benefits, and Mary Ann Smith's lost non-economic damages (pain and suffering). Doc. No. 105 at 69-70.

### a. Mary Ann Smith's past lost earnings and fringe benefits

Plaintiff's expert David Hopkins testified that Mary Ann Smith's past loss earnings total $44,239. Doc. No. 93 at 58; Pl. Ex. 29. Defendant agrees to this figure. Doc. No. 107 at 18. Hopkins further estimated Smith's past lost fringe benefits at $7,900. Doc. No. 93 at 61; Pl. Ex. 29. The government contends that there is no evidence that Smith was receiving fringe benefits at her death, and therefore Plaintiff should not be awarded damages for such benefits. Doc. No. 107 at 18. The Court notes that at the time of her death, Smith was working in a contractor status, without fringe benefit compensation. Doc. No. 94 at 120. The Court will not award such

damages for a period so proximate to Smith's death.  Accordingly, Smith's past lost earnings under the Survival Act are $44,239.  Of this amount, 70 percent is attributed to Defendant, for a total of **$30,967.30**.

### b.  Mary Ann Smith's future lost earnings and fringe benefits

With regard to Smith's future lost earnings and fringe benefits, Plaintiff's expert David Hopkins offered a range based on four possible retirement ages (55, 60, 65, and 70), each correlated with three methods of calculating economic growth (2.5% net interest for present value, 0% net interest, and 2.5% net growth for present value). Pl. Ex. 29. Hopkins testified that Smith's lost earning capacity as of 2011 was $27,607. Doc. No. 93 at 58. He also stated that it was an appropriate estimate for Mary Ann Smith to work until age 60 or above. Id. at 73. Finally, Hopkins stated that Smith's future lost earnings should be calculated at 2.5 percent net growth for present value. Id. at 81-2; Doc. No. 105 at 66. This results in a total of $270,616 for Smith's future lost earnings. Pl. Ex. 29. Defendant's expert Matthew Marlin agreed that age 60 was a reasonable estimate for Smith's work expectancy. Doc. No. 94 at 112. He estimated that Smith's lost earning capacity as of 2011 was $27,157, or $440 less than the amount of $27,607 used by Hopkins. Id. at 113. However, he agreed that Hopkins' estimate was "a reasonable place to start going forward..." Id. at 114. Marlin disagreed with Hopkins as to calculating economic growth of Smith's future lost earnings, indicating that it would be more appropriate to employ the figures for 2.5 percent net interest for present value. Id. at 114. This yields $192,946 in future lost earnings. Doc. No. 107 at 18. The Court notes that while it found the testimony of both experts to be reasonable, it was not overwhelmingly persuaded by either with regard to the appropriate economic growth equation for Smith's future lost earnings. Accordingly, it will

apply the middle equation, or zero percent net interest, to these earnings. Using a retirement age of 60 and Hopkins' starting lost earning capacity of $27,607, this results in $227,261. Pl. Ex. 29.

Plaintiff estimates Smith's past lost fringe benefits at $48,324, based on an equation of 2.5 percent net growth for present value. Doc. No. 105 at 66. As with past lost fringe benefits, the government contends that there is no evidence that Smith was receiving fringe benefits at her death, and therefore Plaintiff should not be awarded damages for such benefits in the future. Doc. No. 107 at 18. Once again, the Court notes that at the time of her death, Smith was working in a contractor status, without fringe benefit compensation. Doc. No. 94 at 120. There was no clear evidence at trial to suggest that status would have changed, and awarding such benefits would be highly speculative and inappropriate. Therefore Smith's total damages for future lost earnings are $227,261. Of this amount, 70 percent is attributed to Defendant, for a total of **$159,082.70**.

### c. Mary Ann Smith's past non-economic damages

Finally, the Court will award Plaintiff $50,000 for Mary Ann Smith's pain and suffering during the period from May 19, 2008 through her death on June 4, 2008. Of course, none of the pain and suffering experienced by Mary Ann Smith *prior* to her visit to the VA on May 19 can be attributable to Dowlut, Scott, or Marlowe. However, once Dowlut failed to properly treat Smith, and Marlowe failed to properly read her CT scan, they were responsible for her ongoing ordeal. Through May 26, this included various degrees of pain and other symptoms, all of which were almost certainly the result of her brain aneurysm. Therefore, for the period from May 20 to May 26, the Court finds that $15,000 is an appropriate amount for these damages. Because Marlowe's actions were 70 percent responsible for Smith's pain and suffering during this period, Defendant is responsible for $10,500 of that amount. With regard to the period from May 26,

43

when Smith was given negligent medical treatment by Scott, to June 4, when she died, Smith again experienced various degrees of pain from her ailment, culminating in her passing out at home on June 1, the significant pain she experienced as she lapsed in and out of consciousness, and the ultimate realization that she was suffering from a life-threatening condition. For this period, the Court has already found Dowlut, Marlowe, and Scott liable for Smith's pain and suffering, and further finds that $35,000 is an appropriate amount for these damages. Because Marlowe's actions were 70 percent responsible for Smith's pain and suffering during this period, Defendant is responsible for $24,500 of that amount. Defendant's total liability for Smith's pain and suffering is **$35,000**.

### d. Total damages under the Survival Act

Therefore, Mary Ann Smith's estate's total damages under the Survival Act total $321,500. Of this amount, Defendant is liable for **$225,050.00**.

## IV. CONCLUSION

The negligence of Dr. Scott Marlowe, an employee of the United States, on May 20, 2008, significantly contributed to the injuries and death of Mary Ann Smith. As a result of Marlowe's negligence, Smith's husband Daniel Smith has been damaged in the amount of $75,069.75; her son Brandon McClain has been damaged in the amount of $3,749,424.70; and Mary Ann Smith's estate has been damaged in the amount of $225,050. These amounts represent 70 percent of the total damages suffered by each of the aforementioned parties. The Court will hold a hearing within 20 days of this decision, with submissions considered from the parties, to determine the establishment and administration of the reversionary trust for Brandon McClain's medical care. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DANIEL SMITH, personal representative for the estate of MARY ANN SMITH, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION NO. 3:09-CV-249 ) JUDGE KIM R. GIBSON |
| UNITED STATES OF AMERICA | ) ) ) |
| Defendant. | ) |

## ORDER

**AND NOW**, this 23rd day of July 2012, the Court having made the foregoing findings of fact and conclusions of law, **IT IS HEREBY ORDERED** as follows:

1. Judgment shall be entered in favor of Plaintiff and against Defendant in the amount of $3,749,424.70 for damages to Brandon McClain under the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301.

2. Judgment shall be entered in favor of Plaintiff and against Defendant in the amount of $75,069.75 for damages to Daniel Smith under the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301.

3. Judgment shall be entered in favor of Plaintiff and against Defendant in the amount of $225,050 for damages to the estate of Mary Ann Smith under the Pennsylvania Survival Act, 42 Pa.C.S. § 8302.

4. A hearing will be held on **August 9, 2012, at 1:30 p.m**. regarding the establishment of a reversionary trust for the purpose of allocating Brandon McClain's medical expenses. The parties are permitted to submit memoranda to the Court, not to exceed 20 pages,

containing proposals as to the establishment and administration of said trust.   These submissions are **due by August 3, 2012**.

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE